IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED ATLANTIC VENTURES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ODYSSEY TRANSFER AND TRUST COMPANY,<br><br>Defendant, | Civil Action No. 24-838-GBW |

## MEMORANDUM OPINION

Pending before the Court is United Atlantic Ventures, LLC's ("UAV") Motion for Summary Judgment (D.I. 16) and Odyssey Transfer and Trust Co.'s ("Odyssey") Cross-Motion for Summary Judgment (D.I. 21). The parties have stipulated that there are no factual disputes and that this case can be resolved on summary judgment. *See* D.I. 9. After hearing oral argument ("Tr.") and for the reasons that follow, the Court **GRANTS** UAV's Motion for Summary Judgment and **DENIES** Odyssey's Cross-Motion for Summary Judgment.

1.   BACKGROUND

UAV is a minority shareholder in Trump Media and Technology Group ("TMTG"). Odyssey is the transfer agent for TMTG. TMTG has gone public through a merger process with a special purpose acquisition company. UAV and TMTG have been embroiled in litigation, and UAV received an order from the Delaware Chancery Court compelling TMTG to give UAV an 8.6% equity interest in TMTG and "otherwise cooperate with [UAV] and [TMTG]'s transfer agent [Odyssey] to ensure that [UAV] receives all [TMTG] stock and earn-out stock to which it is

1

entitled concurrent with the delivery of any stock to Donald J. Trump,[1] Bradford Cohen and/or the TMTG Noteholders." D.I. 1, Ex. F ¶¶ 3-4. UAV's shares of TMTG, like those of Trump and Cohen, contain a lockup, publicly disclosed in SEC filings and set to expire on the earliest of

> (i) the date that is six months after the closing date of the [Merger], (ii) the date on which the closing price for the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalization and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the closing date of the [Merger], and (iii) the date after the closing of the [Merger] on which the Corporation consummates a liquidation, merger, share exchange or other similar transaction that results in all of the Corporation's stockholders having the right to exchange their equity holdings in the Corporation for cash, securities or other property.

The Second Amended Charter, EDGAR, Securities and Exchange Commission (2024), https://www.sec.gov/Archives/edgar/data/1849635/000114036124016719/ef2002 5342_ex3-2.htm. (the "Second Amend. Charter"). The lockup will expire on September 19, 2024, if TMTG shares trade over $12.00 per share until that date.[2]

UAV fears that Odyssey will refuse to transfer UAV's shares concurrently with Trump's. UAV reached out to Odyssey to confirm that Odyssey would remove transfer restrictions from UAV's shares on September 19, 2024, if the share price continues to exceed $12. On May 15, 2024, UAV sent a letter to Odyssey inquiring as to whether Odyssey received instructions from TMTG regarding the expiration of the lockup. D.I. 1, Ex. H. On May 22, 2024, Odyssey replied that it would "be taking direction from TMTG and its legal counsel." D.I. 1, Ex. I; *see* D.I. 1, Ex. J (Odyssey indicating on June 12 that it will "take direction from the issuer"). UAV reached out to TMTG to confirm that it will instruct Odyssey to remove any and all transfer restrictions and deliver UAV its shares

---

[1] The controlling shareholder of TMTG.
[2] The shares of TMTG currently trade at around $17.50.

concurrently with any delivery to Trump. TMTG has not responded. D.I. 1, Ex. J at 4. UAV sent one more letter to Odyssey, asking it to confirm that all requirements have been satisfied to allow for the delivery of the shares to UAV free of any transfer restrictions if the lockup conditions are met. D.I. 1, Ex. K at 5. Odyssey responded by stating that it had no obligation to UAV until the lockup's conditions were fully met. D.I. 1, Ex. Q. Odyssey stated that "consistent with its practice to date, Odyssey's representatives remain willing to engage in reasonable communications with representatives of your client and/or its broker regarding the categories and forms of documents needed to effectuate future desired transfers, with a view towards honoring any valid transfer instructions that it may receive from UAV on a reasonably expeditious basis." *Id.* at 2.

Odyssey commenced litigation, seeking declaratory relief. *See* D.I. 1. After litigation commenced, Odyssey and UAV engaged in substantive discussions that both parties agreed would have resolved the dispute. D.I. 29, Ex. A. Odyssey's proposed stipulation provided that "[w]hen notified by TMTG of the expiration of the Lockup Provisions, Odyssey shall remove restrictions on transfer associated with the Lockup Provisions from all shares of TMTG common stock that are so subject, within a reasonably expeditious time period, **without preference to any TMTG shareholder.**" *Id.* UAV proposed the slight addition of a notice provision. D.I. 29 ¶ 5. Counsel for Odyssey accepted UAV's proposed change with a small caveat, and the parties reached an agreement regarding the material terms that would resolve the litigation. *Id.* ¶¶ 6-7. Odyssey sought approval from TMTG, and ultimately changed its position. Odyssey attempted to change "without preference to any shareholder" to "on the same basis as **other similarly situated TMTG shareholders.**" *Id.* ¶¶ 8-9, Ex. C.

3

2.  **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citation omitted). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* (citation omitted). The Court must enter summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [the non-moving] party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

3.  **DISCUSSION**

The parties largely do not dispute the merits of the underlying cause of action.[3] *See* D.I. 22 at 11-21. There is agreement that Odyssey owes a duty to UAV to transfer UAV its shares when requested and authorized under the law. *See 6 Del. C.* § 8-406; *Jing Jing v. Weyland Tech, Inc.*, 2017 WL 2618753, at *2 (D. Del. June 15, 2017) ("Section 8–401, which describes an issuer's duty to register the transfer of securities, applies to the removal of a restrictive legend because a removal is deemed a registered transfer. Section 8–407 extends the issuer's duty to

---

[3] At oral argument, UAV agreed that if the Court were to require the shares to be transmitted without preference to any shareholder, then UAV's request that the Court order Odyssey to listen to UAV and independently determine that the publicly available lockup conditions are met is unnecessary. 22:18-23:11 ("The Court: [A]s long as they remove the restrictions without preference to any shareholder, then what's wrong with that? UAV's Counsel: "We would agree to that.").

4

transfer agents. Section 8–401(b) provides liability if an issuer is under a duty to register a transfer and either refuses or causes unreasonable delay."). Odyssey has a duty to "act in good faith and present some adequate reason for [any] refusal, and support such refusal by evidence." *Brown v. Matterport, Inc.*, 2024 WL 2745822, at *9 (Del. Ch. May 28, 2024). Instead of substantially disputing the merits, Odyssey contends that it will comply with its obligations without a Court Order. *See* D.I. 22 at 11-21. Thus, Odyssey contends, there is no ripe controversy for the Court to adjudicate. *Id.*

### A. The Settlement Negotiations are Admissible.

As an initial matter, the Court must decide whether the settlement negotiations between the parties are admissible. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Odyssey contends that the change in the settlement agreement is barred by Federal Rule of Evidence 408, which states that evidence of "furnishing, promising, or offering — or accepting, promising to accept, or offering to accept" a settlement offer is inadmissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." *See* D.I. 30 at 3-6. Odyssey contends that UAV is offering the settlement negotiations to prove the validity of its claim, as the existence of a controversy is an element of a declaratory judgment claim. *See id.* (citing (*California v. Texas*, 593 U.S. 659, 672 (2021)).

However, evidence that a case or controversy exists is not offered to prove the validity of the claim. *See 360Heros, Inc. v. Mainstreet Am. Assurance Co.*, 816 F. App'x 555, 557 (2d Cir. 2020) ("Here, the evidence of settlement negotiations was not being offered by MSA to prove the validity of its fee claims, but instead to support its position that 360Heros no longer had a stake in the litigation. Accordingly, the district court did not abuse its discretion in admitting the

evidence."). Indeed, courts have routinely admitted evidence of settlement negotiations in declaratory judgment actions to demonstrate the presence or lack of controversy. *See, e.g., id.*; *Utah Reverse Exchange, LLC v. Donado*, No. 14-0408, 2015 WL 419874, *1 (S.D. Ala. Feb. 2, 2015) (holding that Rule 408 did not preclude the court from considering a settlement offer where the "only purpose of alleging the demand/offer is to establish that there is a live controversy, exceeding the jurisdictional amount, as to which subject matter jurisdiction can attach and declaratory relief can be granted"); *Nat'l Presort, Inc. v. Bowe Bell + Howell Co.*, 663 F. Supp. 2d 505, 507-08 (N.D. Tex. 2009) (evidence "offered to establish the existence of a case or controversy—a legitimate threat of litigation—between the parties" does "not fit within the plain text of evidence Rule 408 deems inadmissible"); *Rhoades v. Avon Prod., Inc.*, 504 F.3d 1151, 1161-62 (9th Cir. 2007) ("Here, DermaNew does not rely on the threats in an attempt to prove whose trademark is valid, or to impeach Avon. Instead, it uses the threats to satisfy the jurisdictional requirements of an action for declaratory relief."). Similarly, in the instant action, UAV does not offer the settlement agreements to indicate that Odyssey *agrees* it owes a duty, but to demonstrate that the parties *disagree* and that a case or controversy exists. Admitting the evidence from the settlement negotiations thus does not implicate the purpose of Rule 408 to promote compromise and to recognize that settlement offers are often driven by a desire for peace rather than a concession of correctness. *See* Fed. R. Evid. 408 Advisory Committee Notes. Because UAV has another permissible purpose for the settlement negotiations, the settlement negotiations are admissible evidence. *See* Fed. R. Evid. 408(b) ("The court may admit this evidence for another purpose . . . .").

### B. The Dispute Between UAV and Odyssey is Ripe.

Odyssey contends that the dispute between UAV and Odyssey is not ripe, and that UAV lacks standing to bring suit against Odyssey. "The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing . . . or . . . ripeness." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007). "[S]tanding and ripeness boil down to the same question in this case." *Id.* In declaratory judgment actions, the Third Circuit applies the *Step-Saver* test and looks to "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004). "[A]lthough our *Step-Saver* test differs in form from the ripeness test articulated in [*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)], or the standing test articulated in [*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)], it is merely a different framework for conducting the same justiciability inquiry." *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 540 (3d Cir. 2017).

#### a. Adversity of Interest

"Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). When "the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412-13 (3d Cir. 1992). However, "the party seeking review need not have suffered a completed harm to establish adversity"—it suffices that there is a "substantial threat of real harm and that the threat . . . remain real and immediate throughout the course of the litigation." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (internal citations omitted).

7

Odyssey's actions during settlement negotiations are powerful evidence of the adversity of interests. When asked at oral argument to explain why Odyssey reneged on its offer to treat all shareholders equally, Odyssey proffered no explanation other than "TMTG may not want its agent to give special accommodations."[4] Tr. 14:20-15:14. Odyssey also contends that the change in language is immaterial, and that despite removing the language saying that Odyssey will treat all shareholders equally, it still plans to do so. *Id.* at 14:1-7. This leads to the question: why did Odyssey let a settlement negotiation fall apart over a change in language it feels to be immaterial? It cannot both be true that Odyssey changed the language to prevent special accommodations, and that Odyssey sees the revisions (from language originally proposed by Odyssey) as immaterial. Odyssey provides no explanation for this discrepancy that does not lead to the conclusion that there is a substantial threat of harm from Odyssey not treating all shareholders equally, as it concedes it must do. By refusing to agree to remove transfer restrictions "without preference to any TMTG shareholder," Odyssey has conceded that a controversy exists.

Even outside of the settlement negotiations, Odyssey's conduct has been elusive. Odyssey repeatedly indicated that it would take its directions from TMTG. D.I. 1, Ex. I; D.I. 1, Ex. J. TMTG explicitly refused to indicate that it would permit Odyssey to remove the transfer restrictions without preference to any shareholder. D.I. 1, Ex. J, at 4. Odyssey indicated that it had no duty to UAV until the lockup expired. D.I. 1, Ex. Q. In Odyssey's declaration to the Court, it indicated that it would only transfer UAV's stock after consulting with TMTG and receiving its authorization. D.I. 23 ¶ 9. While Odyssey in its briefing indicates that it will "remove the restrictions from all affected shares without preference to any shareholder," it has been unwilling to put that into a declaration. *Compare* D.I. 30 (stating that Odyssey will remove the restrictions

---

[4] What special accommodation exists in being treated on an equal basis is left unsaid.

without preference and citing D.I. 23 ¶ 16) *with* D.I. 23 ¶ 16 (containing no sworn declaration that Odyssey will in fact do so). As such, Odyssey's conduct outside of the settlement negotiations also supports a finding that UAV and Odyssey have adverse interests.

### b. Conclusiveness

In analyzing conclusiveness, "courts must determine whether judicial action at the present time would amount to more than an advisory opinion based upon a hypothetical set of facts." *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Engineers, Loc. Union No. 66*, 580 F.3d 185, 192 (3d Cir. 2009). Conclusiveness tests whether "a declaratory judgment definitively would decide the parties' rights" and "the extent to which further factual development of the case would facilitate decision." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001). In this case, a decision definitively would decide the parties' rights, and all parties agree that there are no disputed issues of fact and only legal questions. D.I. 9; D.I. 11. In such cases, declaratory judgment is appropriate. *Abbott Lab'ys*, 387 U.S. at 149 (an issue is ripe where "all parties agree that the issue tendered is a purely legal one" and "[b]oth sides moved for summary judgment.").

### c. Utility

Practical utility goes to "whether the parties' plans of actions are likely to be affected by a declaratory judgment and considers the hardship to the parties of withholding judgment." *NE Hub*, 239 F.3d at 344-45 (3d Cir. 2001) (internal citation and quotation omitted). The potential liability in this case is immense: UAV owns approximately $350 million of TMTG shares, the value of which may dramatically change upon the expiration of the lockup. D.I. 6 ¶¶ 11-12. There is significant practical utility in avoiding that potential liability, and in avoiding the costly litigation that would ensue absent a Court Order. Odyssey's only argument that there is no utility to

9

declaratory judgment is its repeated insistence that it will take the proper steps without a Court Order. D.I. 22 at 17-18. The Court rejects this contention for the same reasons articulated above. *See* III.B.a, *supra*. Accordingly, the Court finds that the practical utility prong of the *Step-Saver* test is satisfied, and there is an Article III case or controversy ripe for adjudication.

### C. UAV is Entitled to Declaratory Relief.

Odyssey briefly suggests that the Court should exercise its discretion to deny UAV relief under the Declaratory Judgment Act. D.I. 22 at 20-21 (citing *Wilton v Seven Falls Co.*, 515 U.S. 277, 287 (1995)). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288. Courts consider eight non exhaustive factors:

(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;

(2) the convenience of the parties;

(3) the public interest in settlement of the uncertainty of obligation;

(4) the availability and relative convenience of other remedies;

(5) a general policy of restraint when the same issues are pending in a state court;

(6) avoidance of duplicative litigation;

(7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for *res judicata;* and

(8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.

*Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014). The "absence of pending parallel state proceedings militates significantly in favor of exercising jurisdiction, although it alone does not require such an exercise." *Id.* at 144.

The first two factors are addressed above and weigh in favor of the Court exercising discretion to hear the declaratory judgment action. In short, the Court's Order will resolve the dispute between the parties and prevent potentially significant liability.

The third and sixth factors weigh in favor of the Court exercising discretion. The public has an interest in resolving litigation expeditiously, fairly, and affordably, and the Court exercising discretion to hear a declaratory judgment action supports that interest. *DiAnoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, 10 F.4th 192, 207 (3d Cir. 2021). There is no special interest of state law that would suggest that the Court should decline to exercise its discretion under the Declaratory Judgment Act to support comity, and Odyssey provides no reason to suggest that the public interest does not support hearing this case.

The fourth, fifth, and seventh factors are neutral. While hypothetically UAV could wait to see if Odyssey refuses to transfer UAV's shares in a timely manner and without preference to Trump, the significant exposure it would take on in such an event makes that potential remedy less than "convenient." There is no state court case hearing this issue. There is no suggestion that UAV was engaged in forum shopping by bringing this action in the District of Delaware.

In sum, four (4) factors weigh in favor of the Court exercising discretion. Three (3) factors are neutral. The eighth factor is irrelevant, as this is not an insurance case. Thus, Odyssey has failed to provide a basis for the Court to decline to exercise its discretion. *See Reifer*, 751 F.3d at 145 (When there are no pending parallel state proceedings, "district courts declining jurisdiction should be rigorous in ensuring themselves that the lack of pending parallel state proceedings is outweighed by opposing factors."). Accordingly, the Court exercises its authority to hear this case pursuant to the Declaratory Judgment Act.

WHEREFORE, at Wilmington this 6th day of September, 2024, **IT IS HEREBY ORDERED** that:

1. UAV's Motion for Summary Judgment (D.I. 16) is **GRANTED**, and Odyssey's Cross-Motion for Summary Judgment (D.I. 21) is **DENIED**.
2. When notified by TMTG of the expiration of the Lockup Provisions, Odyssey shall remove restrictions on transfer associated with the Lockup Provisions from all shares of TMTG.
3. Odyssey shall promptly notify UAV when Odyssey is notified by TMTG of the expiration of the Lockup Provisions.
4. Upon removal of the Lockup Provisions restrictions on transfer, Odyssey shall not interfere with the delivery by DRS Profile or DWAC to UAV's broker.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE